UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

UNITED STATES OF AMERICA,
Case No: 22-20306-CR-GAYLES/TORRES

    Plaintiff,

v.

LUIS FERNANDO VUTEFF,

    Defendant.

_____//

## DEFENDANT FERNANDO VUTEFF'S SUPPLEMENTAL BRIEFING IN OPPOSITION TO GOVERNMENT'S MOTION TO DISQUALIFY

Defendant, Fernando Vuteff ("Mr. Vuteff"), hereby files his supplemental briefing to his response in opposition (D.E. 42) to the government's motion to disqualify (D.E. 37), and avers as follows:

### I. Introduction

At the conclusion of the hearing on May 2, 2023, the Court ordered supplemental briefing directed at several identified cases and authorities. At the time, we advised the Court we would also use the opportunity to provide further briefing on the issue of waiver. We proceed first with the waiver issue then turn our attention to the authorities identified by the Court and a few by the government.

### II. Background

By way of background, Mr. Shohat previously (and for a brief pre-indictment period) represented Witness 1, and Mr. David Markus Esq. (for the same brief period) represented Mr. Alvaro Ledo Nass ("Mr. Ledo-Nass"), the government's recently-secured witness. In that representation, the parties entered into an oral joint defense agreement ("JDA"). As will be

1

demonstrated herein, any arguably confidential communications passing from Mr. Ledo-Nass to Mr. Vuteff's counsel under the JDA are no longer confidential for the following reasons: (1) because under *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003), when Mr. Ledo-Nass became a government witness in exchange for a reduced sentence he surrendered any privileged communications he may have had as to Mr. Shohat; and (2) because it appears that the government and Ledo-Nass are attempting to wield any so-called JDA related privileged communications as a sword in an effort to force the disqualification of Mr. Shohat on the theory that such communications must be shielded from disclosure.

At the time of filing the motion to disqualify in October 2022, the government had not secured any promise to testify from Mr. Ledo-Nass in this case either against Mr. Vuteff or anyone, because he had not yet been charged or agreed to a cooperation plea deal. Such a deal has recently been put in place for Mr. Ledo-Nass.[1] It was only on the eve of the initial hearing on the motion to disqualify on December 19, 2022 that the government secured and filed under seal the affidavits of the Ledo-Nass brothers.[2] This Court held a hearing on December 20, 2022, where the government published and then stood on the affidavit of Mr. Ledo-Nass to argue for disqualification (*see* Tr. 12/20/2022, p. 3-4:23-5). During the second hearing, held on January 10, 2023, Mr. Oscar Rodriguez, Mr. Ledo-Nass's counsel, told the Court that his client, still not having

---

[1] There is no record of any such deal for Witness 1, Mr. Shohat's former client, a fact probably explained by Witness 1's affidavit disclaiming any knowledge of Mr. Vuteff or this case. Therefore, Witness 1 never imparted confidential information to Shohat in any way related to this case and is not part of any conflict of interest.

[2] At the time, the only stated purpose for the sealing of the affidavits was to protect against the public disclosure of the identity of Witness 1 and Mr. Ledo-Nass for security reasons. In court, during the first two hearings on the motion, they were referred to as Witness 1 and Witness 2 for security purposes. However, the contents of the affidavits, were openly discussed during the proceedings and now that Mr. Ledo-Nass has plead guilty and joined team government, his identity is being openly discussed as well (*see* Tr. 12/20/2022, p. 25-28:20-2).

reached a deal with the government, would be asserting his Fifth Amendment rights to remain silent if he was called on to testify on the motion for disqualification.

Mr. Ledo-Nass has now waived any privileged communications that existed under the joint defense agreement. The facts and law, which will be detailed below, is very clear that Mr. Ledo-Nass has waived any claim of privilege in the subject-matter of his communications with Mr. Shohat concerning Mr. Vuteff regarding this case.

### III. The Sword and the Shield

Neither the government nor Mr. Ledo-Nass can selectively use the contents of the JDA communications in this proceeding as a *sword* to gain the upper hand in this litigation, for example, by refusing to formally waive his claim of privilege in order to force the disqualification of Mr. Vuteff's chosen lawyer, and then to *shield* such communications from any use in the case by claiming that the privilege was not waived. *See FDIC v. Bryan* N. 1:11-cv-2790, 2014 U.S. Dist. LEXIS 188215 * at *15 (N.D. Ga. Feb. 14, 2014) ("The subject matter waiver rule is intended to protect against the prejudice that would result if a party were allowed to make a partial and selective disclosure of privileged information. . . . As such, the rule generally provides that a party who reveals part of a privileged communication in order to gain an advantage *in the litigation waives the privilege as to other communications on the same subject matter"); See also, United States v. Coburn*, No. 2:19-cr-00120, 2022 U.S. Dist. LEXIS 21429 *; 2022 WL 357217 (D.C. N.J. Feb. 1, 2022) ("[b]ecause the attorney-client privilege obstructs the truth finding process, it is construed narrowly" and "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege.")

### IV. Legal Standards

*A. Waiver by law*

The government has the burden to show that Mr. Shohat and Jones Walker LLP should be disqualified in the face of Mr. Vuteff's Sixth Amendment right to counsel of choice, and we refer to our response in opposition for that discussion in detail which will not be repeated here. (D.E. 42, pp. 4-8). *Almeida* holds that an attorney in a joint defense setting owes no duty of loyalty to another member of the JDA, only a duty of confidentiality.  341 F.3d at 1323.  However, that confidentiality is waived when the former JDA member becomes a government witness. To be precise, *Almeida* did not hold that a criminal defendant loses the attorney-client privilege just by joining team government and cooperating; however, a JDA member does waive his privilege whenever he withdraws from the JDA in order to become a government witness *as to those communications and information shared in the JDA meetings. Id.* at 1326 ("[W]e do not hold that accomplices always waive the privilege when they testify on behalf of the government; [. . . ] In the joint defense agreement context, however, the policy rationales behind the two exceptions outweigh the minimal benefit of the attorney-client privilege.")

In *Almeida*, the Eleventh Circuit held as follows in no uncertain or qualified terms regarding a joint defense member who turns states' evidence:

> We hold that when each party to a joint defense agreement is represented by his own attorney, and when communications by one co-defendant are made to the attorneys of other co-defendants, **such communications do not get the benefit of the attorney-client privilege in the event that the co-defendant decides to testify on behalf of the government in exchange for a reduced sentence**.

*Id*. at 1326. *See also, United States v. Executive Recycling,* 908 F. Supp. 2d 1156 (D. Colo. 2012) (relying on *Almeida* to deny motion to withdraw by defense counsel based on JDA

communications because facts did not show an actual conflict of interest and defense counsel trusted not to use JDA communications).

### B. Waiver in fact

In the alternative, should the Court find that Mr. Ledo-Nass did not waive the privilege *by law* under *Almeida,* we contend that he waived those communications *in fact* in this federal proceeding under the sword and shield doctrine by intentionally, or without objecting, using the communications and information shared in order to bolster the government's motion to disqualify.

Magistrate Judge Goodman in this District issued an order detailing the law on subject matter waiver that is analogous to what has happened in this case. *See QBE Ins. Corp. v. Jorda Enters.*, 286 F.R.D. 661 (S.D. Fla. 2012).  In that case, Jorda, the defendant, moved for Rule 11 sanctions against QBE, the plaintiff, its law firm and individual attorneys. *See Id.* At the hearing to discuss the scope of an upcoming evidentiary hearing on the Rule 11 sanctions motion, Jorda relayed that it opposed an evidentiary hearing, but QBE desired one. After that hearing, QBE filed a motion *in limine* outlining a proposed procedure, that — in sum and substance — sought leave to submit privileged documents and testimony *in camera* for Judge Goodman's *ex parte* review regarding privileged materials. There were two issues with that proposal as Judge Goodman saw it, first, when one willingly submits privileged communications and materials in a case,  the privilege as to that subject-matter is waived. Second, one cannot selectively open the door as to some privileged materials and close it as to others.

Specifically the court stated as to subject-matter waiver:

> **QBE is the master of its own privilege protection.** If it decides to not introduce privileged documents and not elicit testimony on privileged matters, then the issue never arises and Jorda will not be entitled to obtain privileged information from QBE or its counsel. **On the other hand, if QBE places the privileged matters in issue by seeking to substantively rely on them by introducing**

> **privileged documents and privileged testimony, then it may very well waive the applicable privilege. QBE cannot use the privilege as a sword and a shield.**

*QBE*, 286 F.R.D. at 663 (emphasis added).

As further elaborated by Judge Goodman:

> **When a party affirmatively relies on privileged information, then the information is automatically placed into issue and any privilege that would otherwise attach is impliedly waived.** As succinctly explained in one of the leading treatises on the attorney-client privilege and the work-product doctrine:
>
>> We are told that we cannot have our cake and eat it too. What this means in the privilege context is that a litigant cannot at one and the same time place privileged matters into issue and also assert that what has been placed into issue nonetheless remains privileged and not subject to full discovery and exploration. Edna Selan Epstein, <u>The Attorney-Client Privilege and the Work-Product Doctrine</u> 343 4th ed. 2001).
>
> The waiver-by-affirmative-reliance doctrine arises in both the attorney-client privilege and work-product doctrine scenarios, and both federal and state courts recognize the waiver-by-voluntary-disclosure rule.

*Id.* at 664. Meanwhile, Judge Goodman elaborated on the "waiver-by-affirmative-use doctrine" by stating that it dealt with "fundamental fairness":

>> to protect against the unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable. [ . . . ] If a party could use the privilege as both a sword and a shield, then the party "could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process."

Id. at 664-665 (internal citations omitted).

Likewise, as Judge Goodman charted, Rule 502, Fed. R. Evid. recognizes the waiver doctrine in providing the scope of such a waiver once it has occurred:

#101298612v1

> Federal Rule of Evidence 502(a) provides that the waiver of attorney-client privileged information extends "to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."

*Id.* at 665; *See also Id.* at 664 (*See e.g.* [. . . ] *Hoyas v. State*, 456 So. 2d 1225 (Fla. 3d DCA 1984) (waiver of attorney-client privilege by criminal defendant's voluntary disclosure, during trial testimony, about a significant part of his conversation with counsel)).

## V. Argument

### A. Mr. Ledo-Nass has waived any privilege by becoming a government witness.

We have argued and quoted from the opinion in *Almieda* extensively both in writing herein and in our response (D.E. 42) and during the three hearings (December 19, 2022, January 10 and May 2, 2023) and therefore, we will not repeat all of those quotations here. Suffice it to say that the broad language used by the Eleventh Circuit in reaching its waiver holding as well as that broad and unqualified holding itself is, respectfully, directly applicable and binding on this Court. The Eleventh Circuit did not condition the waiver of JDA communications on the member of the JDA testifying against another member of the JDA, rather, it conditioned it on the former co-defendant JDA member becoming a government witness in exchange for a reduced sentence. The focus is entirely on the objective factors of what the former JDA member/government witness did. The Eleventh Circuit did not say 'only in the event that the co-defendant decides to testify against his partner in the joint defense agreement.' This explains the following language:

> For this reason, we do not hold that accomplices always waive the privilege when they testify on behalf of the government; nor do we hold that persons represented by the same attorney always waive the privilege in the event that one of them becomes a government witness against the other. **In the joint defense agreement context, however, the policy rationales behind the two exceptions outweigh the minimal benefit of the attorney-client privilege.**

*Almeida,* 341 F. 3d at 1326. Mr. Ledo-Nass and the government cannot argue that they are entitled

to the benefit of the JDA privileged communications when Mr. Ledo-Nass withdrew from the JDA

and became a government witness, whether it be testimony against another JDA member or the

client of a former lawyer member of the JDA. Any other rule would make no sense under the broad

language in *Almeida*. (Tr. 1/10/2023, pp. 67-76:15-14). It would be illogical if Mr. Shohat were

still representing Witness 1 and was able to cross-examine Mr. Ledo-Nass under *Almeida*, but not

now that he is even farther removed, representing Mr. Vuteff. **It is axiomatic that a waiver of a**

**privilege, by law or fact, is a waiver as to the world.** During the May 2nd hearing the Court

expressly noted the broad language in *Almeida* regarding waiver (*see* Tr. Excerpt 5/2/2023: 9:21-

24).[3]

***B. Under the sword and shield doctrine, Mr. Ledo-Nass has waived any privilege as to the subject***
***of Mr. Vuteff in this case through a combination of selective disclosure of confidential***
***communications starting in ¶ 7 of his affidavit, then with the dissemination of the JDA materials***
***for use in this case as well as through his May 2nd testimony.***

On December 19, 2022, the day before the first hearing on the motion to disqualify, Mr.

Ledo-Nass's affidavit was filed under seal by the government. In pertinent part the affidavit stated:

> 7. Among the topics discussed, there was a mention about all
> possible people and *activities involved in this investigation,*
> *including Ralph Steinmann and Fernando Vuteff. Discussed were*
> *my interactions, and my possible relationship or knowledge of facts*
> *that were pertinent in the litigation involving these gentlemen.*

(Aff. Alvaro Ledo-Nass, sealed filing Dec. 19, 2022, ¶7) (emphasis supplied). By stating more in

the affidavit than just the topics of his JDA discussion with Shohat, though limited, Mr. Ledo-Nass

---

[3] As we have said, the illogic of the government's position is readily discernable simply by
considering the following hypothet: Mr. Vuteff and Mr. Shohat's former client, now represented
by another attorney, are jointly tried in a case where Mr. Ledo-Nass testifies for the government
against both. It make no sense that Witness 1's current counsel could cross examine Mr. Ledo-
Nass but Mr. Vuteff's attorney could not. This is the result being urged on the Court by the
government.

has published outside of the confidential JDA setting, the fact that he disclosed the "…possible relationship or knowledge of facts that were pertinent in the litigation…" The affidavit, which was likely prepared (or at least approved) by counsel for Mr. Ledo-Nass, and which is sworn-to by him, opens the door a crack to the much broader subject-matter waiver created by his later agreed dissemination of JDA materials along with his in-court testimony on May 2, 2023, which, in combination, are part of a joint effort to use JDA communications they claim are confidential to force the disqualification of Mr. Shohat by using selected portions of JDA confidential communications while at the same time shielding them from use in the defense of Mr. Vuteff in this case.  Rule 502, F. R. Evid., provides for the scope of waiver when waiver is made in a federal proceeding:

> **Rule 502. Attorney-Client Privilege and Work Product; Limitations on Waiver**
> The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client privilege or work-product protection.
> (a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver. **When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection,** the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
> (1) the waiver is intentional;
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
> (3) they ought in fairness to be considered together.

As the Court noted in the *Bryan* case, *supra*, the privilege will not survive such selective use in court proceedings. Our own Magistrate Judge Goodman, in the *QBE* case *supra,* expanded on this sword and shield "waiver-by-affirmative-use" doctrine to foreclose the proposed use of attorney-client and work-product privileged documents during an *in-camera, ex* parte proceedings.

**C. Mr. Ledo-Nass waived the privilege by not objecting to the dissemination of JDA materials to the Court or to the government to be used and poured over in this federal proceeding.**

9

The government and Mr. Ledo-Nass waived any JDA privilege when they did not object to the court-ordered dissemination of the JDA materials to the Court and ultimately to Mr. Wallace, the government's filter counsel. In this proceeding, the Court directed Mr. Shohat and Mr. Rodriguez to provide, for the Court's review, the JDA materials (*see* Tr. 12/20/2022, pp 80:8-17). Neither the government nor counsel for Mr. Ledo-Nass objected. Counsel for Ledo-Nass provided purportedly confidential JDA materials provided by Mr. Ledo-Nass directly to the Court as well.[4]

The JDA materials were provided to the Court prior to the hearing that was held on January 10, 2023. At that hearing, Mr. Harry Wallace was present for the government as its filter lawyer, in order to shield Mr. Lunkenheimer and other trial lawyers from the JDA materials. At the Court's request, Mr. Shohat walked the Court and Mr. Wallace through the pertinent portions of the JDA materials.

Mr. Ledo-Nass, through counsel, could have, but did not, propose a protocol for the dissemination and consideration for this Court to review the JDA materials, so as not to waive the privilege. Counsel for Mr. Vuteff would have had an opportunity to participate or oppose such a protocol. For example, in *United States v. Patel*, Judge Reinhart issued an order outlining the following protocol in a joint defense privilege scenario:

> 9. In order to avoid protracted litigation over White's privilege claims, the Parties agree to the following:
> [. . . ]
>> d. White and the Filter Team agree that pursuant to Section 5(f) of the Discovery Protocol Order, White's authorization to produce the (i) the Records at Issue; and/or (ii) other material potentially subject to the purported common interest [*5] agreement formed on March 1, 2019 in this Litigation to Defendant Patel and the Prosecution Team

---

[4] To the extent that they may conflict, the memoranda provided to the Court by counsel were drafted contemporaneously with the JDA meetings and are, we respectfully suggest, far more trustworthy as to the matters discussed at the time than Mr. Ledo-Nass's recollection could be some four to five years later.

#101298612v1

> **shall not constitute or be deemed a waiver or forfeiture of any claim of attorney-client privilege or work product protection, or a subject matter waiver**, in any prosecution against White by the United States.

*United States v. Patel*, No. 19-cr-80181-Ruiz/Reinhart, 2020 U.S. Dist. LEXIS 180256 *, at *4 (S.D. Fla. Sep. 20, 2020). Without any protocol in place, the dissemination by both Mr. Shohat and counsel for Mr. Ledo-Nass of notes and memoranda detailing the confidential JDA communications, without objection, constituted an implied waiver. *See QBE Ins. Corp. supra.,* at 661 ("[a]s a general rule, the smaller the amount of privileged information disclosed, the narrower the scope of the waiver. Thus, if QBE opts to elicit privileged information from many of its attorneys and to introduce into evidence reports and comprehensive memoranda, then it is likely that the waiver will be substantial."); *See also, United States v. Coburn, et al.,* Case No. 19-CR-00120-KM, DE 268, pp. 13-14 (D.N.J. Feb 1, 2022) (even where government invited law firm to disclose results of internal investigation, doing so waived the attorney-client and work-product privileges with respect to the "same subject matter" as investigation, *citing Shire LLC v. Amenal Pharms., LLC,* No. 2:11-CV-03781, 2014 WL 1509238, at 6 (D.N.J. Jan. 10, 2014)(citing Fed. R. Evid 502(a)).

### *D. Mr. Ledo-Nass waived the privilege by testifying in a federal proceeding as to his communications with Mr. Shohat.*

Lastly, at the end of that hearing on January 10, 2023, after the Court expressed concern that the record may not support an order of disqualification, Mr. Lunkenheimer impugned the Court to question Mr. Ledo-Nass directly, if it was not convinced by his affidavit or *in-camera* review of the JDA materials. Specifically, Mr. Lunkenheimer argued, "The only last piece potentially **would be <u>not</u> to hear more from Witness 2 about his testimony against Mr. Vuteff but to hear from Witness 2 as to any oral communications that were part of the joint defense agreement as to Mr. Vuteff** if those documents you reviewed today have more that was said

orally or communicated telephonically. I believe they are, based on the representations of counsel. But that would be, unless you're -- you've seen enough or have enough. But that would be the last step and we would we would ask that that be completely ex parte with Your Honor, Witness 2, and his counsel." (Tr. 1/10/2023, 90-91:22-9)

During the May 2, 2023, hearing just before the courtroom was sealed to hear from Mr. Ledo-Nass, the government stated again that the Court should inquire into *what Mr. Ledo-Nass discussed with Mr. Shohat in oral communications* not covered by the JDA materials previously provided to the Court. Thus, on at least two occasions the government has literally invited the Court to inquire into Mr. Ledo Nass's recollection of his oral communications with Mr. Shohat under the JDA. We surmise that during the hearing which ensued (but from which we were excluded)[5], Mr. Ledo-Nass endeavored to complete the tale his affidavit started, and the JDA materials purportedly omitted, as part of a joint effort with the government to use selective disclosure of JDA communications as both a sword and a shield, and to gain the upper hand in this litigation.

On May 2, 2023, the courtroom was sealed and we understand that Mr. Wallace did the direct of Mr. Ledo-Nass, and Mr. Sam Rabin, Mr. Vuteff's filter lawyer, did the cross-examination. The sealed portion took more than 3.5 hours. Undersigned counsel can only reasonably assume that Mr. Ledo-Nass was in fact questioned in detail *as to his oral JDA communications with Mr. Shohat*, and because of the rather extraordinary length of the hearing (even accommodating for interpreter time), that Mr. Ledo-Nass's testimony departed substantially from what the JDA materials showed.

---

[5] D.E. 80 is Mr. Vuteff's Motion to Disclose the *in-camera* hearing on May 2, 2023, containing Mr. Ledo-Nass's testimony.

#101298612v1

In the *QBE* case, Judge Goodman echoed a truism that applies here with equal force: "a party is not obligated to disclose privileged information [. . . ] it has the opportunity to decide *whether* to make such a disclosure." QBE, 286 F.R.D. at 665. The government and Mr. Ledo-Nass could have stood on Mr. Ledo-Nass's affidavit, and legal argument, but they did not. They could have required the Court to order the testimony over objection. They did not.  Beyond the agreed dissemination of written JDA communications, the government twice proposed, and Mr. Ledo-Nass' counsel did not object, to "hearing from witness 2" concerning "any oral communications that were part of the joint defense agreement as to Mr. Vuteff if those documents [the Court] reviewed today have more that was said orally or communicated telephonically." (Tr. 1/10/2023, 90-91:22-9). In the *QBE* case, Judge Goodman stated: "QBE may stop the waiver doctrine from applying by not voluntarily disclosing privileged information at the evidentiary hearing." *QBE*, 286 F.R.D. at 665. Much like in this case, *QBE*, "sought an evidentiary hearing and announced an intent to itself use privileged information at the evidentiary hearing." *Id.* at 666.  In this case, the government insisted that the Court needed to hear from Mr. Ledo-Nass as to his JDA communications and tendered him for testimony without any safeguards or protocols. *See also Coburn, supra* (privileges waived by invited disclosure of law firm's internal investigation). Much like QBE, "if [the privilege-holder] decides to rely on attorney-client privileged information at the evidentiary hearing, then it will have generated a waiver applicable to all other attorney-client communications relating to the same subject matter." *Id.*[6]

Should the government argue, or the Court consider, that no waiver occurred because the JDA communications by Mr. Ledo-Nass occurred in this case during *in-camera* proceedings, even

---

[6] The waiver is not only governed by the case law, but additionally found in Rule 502, Fed. R. Evid. and in the Committee Notes to that rule for its scope and breadth.

13

ones invited or ordered by the Court (without objection from them), this is precisely what Judge Goodman rejected in the *QBE* case where privileged documents and testimony were to be submitted in connection with *in-camera* proceedings and for *ex parte* review. *QBE, supra*., 286 F.R.D. at 663. <u>As reasoned by Judge Goodman</u>, such an argument dies of its own weight given that both the government and witness are asking the Court to rely on such communications to make the disqualification decision. This is the very use of JDA communications as a sword while simultaneously seeking to shield them from other use which the case law we have cited and Rule 502(a), F. R. Evid, preclude.

Clearly, under both *Almeida* and under Rule 502, F. R. Evid., as well as the applicable case law, any JDA privilege that existed has been waived by law and in fact.

## VI. Supplemental Briefing on Cases and Secondary Materials

We begin this section by noting that none of the authorities we have been asked to address are or involve criminal cases in the Eleventh Circuit. Most, including both ABA sources we address below (one referenced by the Court and the other by the government), involve civil cases which arise in contexts very different from this case and,  therefore, do not implicate the Sixth Amendment Right to Counsel of Choice which is at the heart of this criminal case. Even the two referenced criminal cases, *Henke* and *Stepney*, which are distinguishable for other reasons, are not Eleventh Circuit cases, and their impact is also severely blunted in that they both pre-date *Almeida*. Plus, these cases do not even address the waiver and independent counsel issues which are an important part of this case.

The Court also expressed concern why *Almeida* did not address the Bar Rules. But the Bar Rules do not deal with the issue at hand: the duty an attorney owes a former JDA member who was represented by his own attorney and who subsequently withdraws from the JDA to become a

#101298612v1

government witness. The Bar Rules only deal with former clients and new clients in substantially related matters where the parties are adverse. *See e.g.,* Fla. Bar Rule 4-1.7 and 4-1.9. *Almeida*, however, does make clear that, to the extent that the confidentiality of JDA communications remains intact (i.e. no member defects to become a government witness) that duty is owed by the attorney of the non-client JDA member to the latter, but no duty of loyalty exists. 341 F.3d at 1323. Crucially, however, *Almeida* holds, that the former JDA member waives this *limited* privilege (i.e. duty of confidentiality) when he withdraws from the JDA and becomes a government witness. *Id.* at 1324.

### A. United States v. Henke, 222 F.3d 633 (9th Cir. 2000)

*Henke* pre-dates *Almeida*, is from the Ninth Circuit and is a very different case. In *Henke*, the lawyers moved to withdraw based on what they perceived was a conflict with a former JDA member turned government witness. The district court denied the motions to withdraw and when the witness testified they declined to cross-examine him claiming they could not do so without using confidential information imparted by the witness during the joint defense meetings. The issue of waiver inherent in the witness turning state's evidence was not in play and not addressed. We note, however, that the *Henke* panel did point out that the alleged JDA confidential information was contrary to the witness' trial testimony. 222 F.3d at 635.[7] The Ninth Circuit reversed the convictions in *Henke* holding that the trial judge erred in not granting the lawyers' motions to withdraw. To the extent that the case states that "[a] joint defense agreement establishes an implied attorney-client relationship with the co-defendant[.]" such pre-*Almeida* language is not binding

---

[7] Mr. Vuteff's counsel, without access to the actual testimony of Mr. Ledo-Nass during the so far sealed hearing on May 2nd, can only guess that the same situation may exist here and that, without specific further briefing by Mr. Vuteff's counsel after an opportunity to review that testimony, the issue of the impact of such a contradiction on this motion and this case will go unaddressed. We have filed a motion to disclose Mr. Ledo-Nass' testimony. (DE 80)

#101298612v1

where the language in *Almeida* is contrary and binding on this Court.  *See Almeida*, 341 F.3d at 1323. The *Henke* opinion also does not discuss the distinction between a duty of loyalty and a duty of confidentiality, as *Almeida* does.

Finally, because the *Henke* case dealt with a motion to withdraw and not a motion to disqualify, there was no discussion of the Sixth Amendment right to counsel of choice. In *Henke*, the client did not waive. But here, Mr. Vuteff has waived his right to "conflict-free" counsel given that he would be hiring independent counsel for the task of addressing and handling all matters related to Mr. Ledo-Nass. Mr. Vuteff has also waived his right to appeal on ineffective assistance of counsel grounds if the Court would deny the government's motion to disqualify. (*See* Tr., 1/10/2023: 134-135:1-22).

Should the court determine that some or all JDA communications still deserve confidentiality protections, Vuteff contends that Mr. Bieber handling the cross-examination of Mr. Ledo-Nass, no less than the government using Mr. Wallace to protect it from exposure to JDA confidences during these proceedings, is a more than adequate resolution. *See e.g., U.S. v. Executive Privilege*, supra., at 1160-1161 (noting that by not being able to use confidential JDA communications counsel is in no different position than new counsel would be and denying motion to withdraw). We discern no reason why trial counsel in the *Executive Privilege* case could be trusted not to use JDA confidences, but the undersigned cannot.

**B.  *United States v. Stepney,* 246 F. Supp. 2d 1069 (N.D. CA 2003)**

Like the *Henke* case, the *Stepney* case is an out-of-circuit pre-*Almeida* decision of no real precedential value. *Stepney* is also a very different case, having nothing whatsoever to do with a government motion to disqualify defense counsel based on an alleged conflict of interest. In *Stepney,* the court ordered the defendants to submit *in-camera* for review and approval two

16

proposed Joint Defense Agreements to be employed by defense counsel in a gang related case involving 30 defendants. Instructive of the situation in our case, the *Stepney* court rejected a provision in the agreements creating a duty of loyalty among the lawyers who signed the JDA to each member of the JDA. In our case, we believe that it has already been settled that no such duty of loyalty exists between the witness and the law firm pursuant to *Almeida*. The *Stepney* case does not address the issues of waiver, independent counsel or the Sixth Amendment present in the Vuteff case.

### C. City of Kalamazoo v. Michigan Disposal Serv. Corp., 125 F. Supp. 2d 219, 2000 U.S. Dist. LEXIS 19982 (W.D. Mi. 2000)

This is a civil case which does not involve any issue of waiver, independent counsel, or the Sixth Amendment rights of a criminal defendant. In *City of Kalamazoo*, the court dealt with a government motion which rested on an inapposite set of facts because none of the authorities relied on involve a waiver of confidentiality in the subject matter conveyed under the JDA. Additionally, in the *City of Kalamzoo* case it appears that the lawyer *represented* the entire joint defense group and, therefore, had a duty of loyalty to all of them which is a very different situation from this case.

### D. Essex Chem. Corp. v. Hartford Accident & Indem. Co., 993 F. Supp. 241, 1998 U.S. Dist. LEXIS 899 (D.N.J. 1998)

In this civil case, the Magistrate was reversed after disqualifying *without a hearing* all defense counsel from the Skadden law firm because they had been part of a JDA. The decision was based on improper irrebuttable presumptions including a *per se* rule of disqualification. The Magistrate Judge simply cited ethics Rule 1.9(a)(1) and disqualified Skadden based on a finding that the prior representation concerned matters substantially similar to the present action. This case pre-dates *Almeida*, is not from our Circuit and therefore cannot trump *Almeida's* language

#101298612v1

regarding what attorneys owe to non-client JDA members, and since it is a civil case, does not address Sixth Amendment rights or the use of independent counsel.

**E. *All Am. Semiconductor, Inc., v. Hynix Semiconductor, Inc.*, 2008 U.S. Dist. LEXIS 106619, 2008 WL 5484552 (N.D. Ca. 2008)**

This out-of-circuit civil case cited by the government is simply not our facts. It does not involve or even address an *Almeida* situation where the confidentiality of JDA shared information is waived because the JDA party has turned government witness and thereby has waived any confidentiality in what he may have told his non-attorneys during the JDA. Nor does it address an independent counsel proposal. Frankly, this waiver issue is not present in any authority relied on by the government.

**F. *AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY Formal Opinion 95-395 Obligations of a Lawyer Who Formerly Represented a Client in Connection With a Joint Defense Consortium > July 14, 1995 and Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1997)**

This pre-*Almeida* article about a civil case issue involves a question about a lawyer who represented one member ("Insurance Company") of a civil case "joint defense consortium" made up of a large number (20-30) of insurance companies in an insurance matter. That lawyer had now left his law firm and had been approached by a new client who wanted to bring suit, not against Insurance Company, the lawyer's former client, but against other members of the "joint defense consortium". The article states that:

**A lawyer who has represented one, but only one, of the parties in a joint defense consortium does not thereby acquire an obligation that poses an ethical bar to the lawyer thereafter taking on a related representation adverse to any of the other parties.** However, the lawyer's obligations to the party he represented may present such a bar, and the lawyer will almost certainly have undertaken fiduciary obligations to the other parties that have the same

effect. (Article at page 1). Regarding the "joint defense consortium", the article states unequivocally that no ethical bar exists to prevent the JDA lawyers going adverse but then makes reference to a "fiduciary obligation" to members of the consortium which could serve as a bar to the lawyer suing them. The article cites to *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F. 2d 250, 253 (5th Cir. 1977), for this proposition:

> (holding that a lawyer should be disqualified from bringing suit against a former co-defendant of a client he had represented, when there is a substantial relationship in the subject matter of the two representations and confidential information was shared in the prior representation)". There is a footnote cited which states "[t]his fiduciary obligation is said to arise from the law of agency (the lawyer having been a sub-agent of the client who in turn was the agent of the co-defendant with whom confidential information was shared) rather than from the law governing lawyers. *See* Restatement (Third) of the Law Governing Lawyers § 213 comment g(ii) (Preliminary Draft Nov. 11, 1995)

We see nothing in the article suggesting that the same "agency" principles even apply in a criminal case JDA context where each client is represented by their own independent counsel. The Wilson case also pre-dates Almeida, is out-of-circuit, and does not discuss the constitutional issues in this case. In the *Wilson* case, from 1977, the Fifth Circuit stated, "[w]e agree and hold that when information is exchanged between various co-defendants and their attorneys that this exchange is not made for the purpose of allowing unlimited publication and use, but rather, the exchange is made for the limited purpose of assisting in their common cause. In such a situation, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of the co-defendants."

The obvious problem with this analysis is that it does not apply where the former co-defendant turned state's evidence by becoming a cooperating witness or where he waived the privilege by publishing the confidential communications to the Court, prosecutors or others. The "fiduciary duty" analysis is just another way of saying "duty of loyalty." Blacks Law Dictionary

5th Edition defines "fiduciary" as "A person having duty, created by his undertaking, *to act primarily for another's benefit* in matters connected with such undertaking." (Italics added) Likewise, the 11th Circuit Pattern Jury Instructions in Civil Cases, 6.4 states that "The term 'fiduciary duty' means the duty one person owes to another in special relationships of trust and confidence, in which one person justifiably expects the person who owes the duty (the fiduciary) *to act in the best interests* of the person to whom the duty is owed. The duties a financial advisor, an accountant, and an attorney owe to their clients are types of fiduciary duties." (Italics added) Mr. Shohat never represented Mr. Ledo-Nass and does not owe him the duty of loyalty which, by definition, underpins the duty of a fiduciary.

**G. ABA Article cited by the Government: Arnold Rochvarg, "Joint Defense Agreements and Disqualification of Co-Defendant's Counsel" University of Baltimore (Fall 1998) (https://scholarworks.law.ubalt.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1581&context=all_fac)**

This article deals exclusively with civil cases none of which involve a waiver of privilege. In every case, most of which did not result in a disqualification, the issue dealt with confidential information passed to the lawyer under the JDA which remained confidential. The article does cite the ABA article previously discussed in Part "F" in connection with the ABA article referenced by the Court as well as the single "fiduciary duty" case cited in that article. This is different from the Vuteff case in which confidential information was exchanged during the JDA back in 2018-2019, but that information *no longer remains confidential* for the reasons detailed herein. None of the civil cases cited in the article involve an issue of waiver, independent counsel or of the Sixth Amendment.

WHEREFORE Defendant, Fernando Vuteff, respectfully reiterates his request that this Court deny the Government's Motion to Disqualify Mr. Shohat and Jones Walker LLP.

Respectfully submitted,

**JONES WALKER LLP**
201 S. Biscayne Blvd., Thirtieth Floor
Miami, Florida 33131
Telephone: 305-679-5700
Facsimile: 305-679-5710
Email: eshohat@joneswalker.com
**/s/ Edward R. Shohat**
Florida Bar No. 152634
Email: mgarcia@joneswalker.com
**/s/ Monique Garcia**
Florida Bar No. 0085004
Email: dweinstein@joneswalker.com
**/s/ David S. Weinstein**
Florida Bar No. 749214

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 16th day of May, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

**/s/ Edward R. Shohat**
**EDWARD R. SHOHAT**

#101298612v1