## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 22-20306-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

     *Plaintiff,*

vs.

LUIS FERNANDO VUTEFF,

     *Defendant.*

_____/

## ORDER ON MOTION TO DISQUALIFY
## <u>COUNSEL EDWARD ROBERT SHOHAT AND JONES WALKER</u>

This matter is before the Court on the United States' (the "Government") motion to disqualify Edward Robert Shohat ("Mr. Shohat") and the law firm of Jones Walker (the "Firm") (collectively, "counsel") from representing Luis Fernando Vuteff ("Mr. Vuteff" or "Defendant") in these criminal proceedings.  [D.E. 37].  Defendant filed his response to the motion on November 1, 2022. [D.E. 42].  The Court held four hearings on the matter on December 20, 2022, January 10, May 2, and May 19, 2023. Following the May 2 hearing, the Court requested the filing of supplemental briefing, which the parties filed on May 16, 2023. [D.E. 83, 84].  Therefore, the Government's motion is now ripe for disposition.[1]  After careful consideration of the motion,

_____

[1] On November 1, 2022, United States District Judge Darrin P. Gayles referred the subject motion to the undersigned Magistrate Judge for disposition.  [D.E. 41].

response, additional briefings, relevant authority, and for the reasons discussed below, the Government's motion is **GRANTED**.

## I.   BACKGROUND

The Government's motion presents a unique situation involving very well respected counsel, Edward Shohat and his law firm Jones Walker, who has been retained by a criminal defendant charged in an expansive multi-defendant conspiracy.  Here, the alleged disqualifying conflict does not arise from information that counsel received form a former client, but from the confidences that Mr. Shohat obtained from his former client's brother during a pre-indictment representation that involved a Joint Defense Agreement ("JDA").  That representation concerned Mr. Shohat's former client's, Adolfo Ledo Nass ("brother 1"), and his brother's, Alvaro Ledo Nass ("brother 2"), involvement in a 2018 criminal complaint relating to a bribery and money laundering conspiracy.  The Government now submits that, because brother 2 will testify about Mr. Vuteff's role in that same bribery and money laundering scheme, the confidences that brother 2 shared with Mr. Shohat during that JDA preclude counsel from representing Mr. Vuteff in this case.  And even though Mr. Shohat's new client has fully waived any such potential conflict from his perspective, brother 2 has expressly refused to waive any conflict that he legally has standing to assert.

The undersigned conducted four hearings to address the parties' arguments and assess whether counsel should be disqualified from representing Mr. Vuteff due to Mr. Shohat's involvement in the JDA.  The Court's inquiry during those hearings

included an in camera review of sealed affidavits submitted by brother 1 and brother 2, JDA-related documents that were in Mr. Shohat's possession, multiple government-issued ROIs, and the sealed testimony of brother 2. The relevant facts necessary to resolve this conflict question were established during these hearings and are virtually undisputed by Defendant. In relevant part, those facts are as follows.

The 2018 criminal complaint alleged that the underlying conspiracy unfolded between December 2014 and 2018, culminating in the embezzlement of hundreds of millions of dollars from Petróleos de Venezuela, S.A. ("PDVSA"). *See United States v. Convit Guruceaga, et al.*, 18-cr-20685-WILLIAMS (S.D. Fla. Aug. 16, 2018) [D.E. 3] ("The Williams Complaint"). As part of the conspiracy, the alleged perpetrators made bribery payments to Venezuelan officials (including brother 2) in return for orchestrating fraudulent loan transactions that facilitated the diversion of millions of dollars from PDVSA. *Id*. Additionally, in furtherance of the scheme, the involved individuals sought the assistance of financial services providers (including Mr. Vuteff) to conceal and access portions of their illegal proceeds through the use of international banking systems. *Id*.

Brother 1 and brother 2 were anonymously identified in the 2018 criminal complaint (as was Mr. Vuteff). Thus, they both retained criminal defense counsel concerning those criminal allegations soon after they became public in July 2018. Brother 1 retained Mr. Shohat as defense counsel, and brother 2 retained David Oscar Markus. At the outset of the representation, the brothers insisted on pursuing a joint defense strategy, so brother 1 and brother 2—and their respective counsel

including Mr. Shohat—entered into an oral JDA around August 2018. Mr. Vuteff was never a party to this JDA.

For the next five to six months, the brothers and their respective counsel had multiple meetings in Panama (at least two of which were full-day debrief and strategy meetings) plus several conference calls, where all aspects of the brothers' alleged involvement in the scheme, including their relationships and contacts with the other parties identified in the 2018 complaint, were openly discussed with Mr. Shohat's and Mr. Markus' legal teams. Ultimately, Mr. Shohat represented brother 1 for approximately eight months during 2018-2019 (before any charges were filed against him). Mr. Shohat was then discharged in early 2019 by brother 1. Mr. Markus, as counsel for brother 2, was also discharged at about the same time, both in favor of new substitute counsel. No argument has been made that the reasons or circumstances behind counsel's discharge at that time have any bearing on the issues presented here.

Based on our *in camera* review of the documents and testimony provided during the evidentiary hearings, the Court is satisfied that, in the course of these joint-defense discussions, Mr. Shohat and his firm obtained confidential information from both brother 1 and brother 2. It is also clear that the confidences conveyed during the joint defense discussions by brother 2 to Mr. Shohat relate to and are materially adverse to his current client, Mr. Vuteff. It was further established during the evidentiary hearings that the subject matter of the brothers' pre-indictment representation is substantially related to this criminal case against Mr. Vuteff, as

both complaints stem from the same criminal conspiracy.  [D.E. 78 at 10:21–22]; [D.E. 3].

Mr. Vuteff was indicted by a federal grand jury in the Southern District of Florida on July 12, 2022, with one count of conspiring to launder money for his role in the PDVSA bribery and money laundering scheme.  [D.E. 3, 10].  On February 24, 2023, brother 2 was also charged by information with money laundering in connection with the PDVSA scheme.  *United States v. Ledo Nass*, 23-cr-20089-WILLIAMS (S.D. Fla. Feb. 24, 2023) [D.E. 1].  On March 29, 2023, brother 2 pleaded guilty to that charge and agreed to cooperate with the Government, including agreeing to testify at any hearings or trials.  *Id.* at [D.E. 13, 15].  Consistent with that cooperation agreement, brother 2 will be a witness for the Government at Mr. Vuteff's criminal trial.

On July 14, 2022, Mr. Shohat entered a temporary appearance in this case as counsel for Mr. Vuteff, along with two other lawyers from his firm Jones Walker, and on October 24, 2022, Mr. Shohat filed an appearance for trial only.  [D.E. 12, 35].  On that same day, the Government filed the current motion to disqualify Mr. Shohat as counsel for Mr. Vuteff based on the alleged conflict of interest that arises from his prior representation of brother 1 and his corollary participation in the JDA with brother 2. [D.E. 37].

Neither brother has waived any conflict of interest to allow Mr. Shohat to represent Mr. Vuteff after Mr. Shohat's prior representation of brother 1, and his receipt of confidential information from brother 2 as a participant in the JDA.

[D.E. 61, 62].   In addition, brother 1 has not consented to Mr. Shohat revealing information relating to his representation, nor has brother 2 consented to Mr. Shohat revealing information that Mr. Shohat learned during the JDA.  *Id.*

## II.   APPLICABLE PRINCIPLES OF LAW

"The right to conflict-free counsel is included in the Sixth Amendment right to effective assistance of counsel."  *United States v. Gutierrez*, No. 10–80083–CR, 2010 WL 3769448, at *2 (S.D. Fla. Aug. 3, 2010) (citing *Duncan v. Alabama*, 881 F.2d 1013, 1017 (11th Cir. 1989)).  "In determining whether to disqualify a defendant's counsel, a court must balance the right to counsel of defendant's choice with the defendant's right to a conflict-free attorney."  *Id.* (citing *Wheat v. United States*, 486 U.S. 153, 162–63, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)).  Thus, a defendant's right to counsel of choice is not absolute.  *United States v. Ross*, 33 F.3d 1507, 1522–23 (11th Cir. 1994).  "The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial."  *Id.*

To decide if a conflict warrants disqualification, the court must examine whether the subject matter of the first representation is substantially related to that of the second.  *Id.* at 1523.  The examination pursues "to discover whether the defense lawyer has divided loyalties that prevent him from effectively representing the defendant."  *Id.*  Disqualification may be proper if a conflict could deter an attorney "from intense probing of the witness on cross-examination to protect privileged

communications with the former client or to advance the attorney's own personal interest." *Id.* Further, if one attorney in a law firm has a conflict of interest, this conflict is imputed to all attorneys in the firm. *Id.*

In cases where an actual conflict would subject an attorney to disqualification, a client may waive this conflict, so long as the waiver is knowing, intelligent and voluntary. *Id.* at 1524. However, even if all affected clients waive a conflict of interest, a district court may, in its discretion, disqualify the conflicted counsel. *See Wheat*, 486 U.S. at 160, 162. This is because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160. Therefore, district courts have "substantial latitude" to refuse a waiver "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163.

Moreover, pursuant to Rule 11.1(c) of the Local Rules for the Southern District of Florida, "[t]he standards of professional conduct of members of the Bar of this Court shall include the current Rules Regulating the Florida Bar." The following two Rules are particularly relevant to the issue before us: Rule 4–1.6 and Rule 4–1.9. Rule 4–1.6 provides that lawyers must not reveal confidential information without informed consent:

> (a) Consent Required to Reveal Information. A lawyer must not reveal information relating to representation of a client except as stated in subdivisions (b), (c), and (d), unless the client gives informed consent.

7

Fla. Bar R. of Prof'l Responsibility R. 4-1.6(a).

Rule 4–1.9 of the Florida Bar's Rules of Professional Conduct provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent; or

(b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or

(c) reveal information relating to the representation except as these rules would permit or require with respect to a client.

## III.   ANALYSIS

As noted above, this Court's *in camera* review of the evidence and testimony presented by the parties established: (i) that the pre-indictment representation of brother 1 and brother 2 concerned a subject matter that is substantially related to this criminal case against Mr. Vuteff; (ii) that Mr. Shohat was privy to confidential information from brother 1 and brother 2 during the multiple joint defense meetings; and (iii) that the confidences that Mr. Shohat obtained by virtue of his participation in the JDA directly relate to and are materially adverse to Mr. Vuteff.  These facts are undisputed.

Notwithstanding the above, Mr. Vuteff submits that disqualification of Mr. Shohat and his law firm is unwarranted in this case.   This is so because, in Defendant's view, brother 2 has waived any applicable duty of confidentiality that

may have attached to Mr. Shohat during the JDA.  Defendant's argument is twofold: first, he argues that under the Eleventh Circuit's holding in *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003), brother 2 waived his JDA confidentiality privilege as to Mr. Shohat and Mr. Vuteff once he became a government witness; second, and in the alternative, Mr. Vuteff submits that brother 2 waived any claim of privilege in the subject-matter of his communications with Mr. Shohat during the JDA by virtue of his participation in these disqualification proceedings.  [D.E. 42 at 10–13, 84 at 4–7].   Finally, Mr. Vuteff adds that, even if this Court finds that a confidentiality privilege applies, any conflict of interest arising from Mr. Shohat's participation in the JDA can be sufficiently mitigated by using independent counsel to handle brother 2's cross-examination at trial.  As we explain below, Defendant's arguments are ultimately not persuasive.

### A.   *Fiduciary Duties Arising From Joint Defense Agreements*

The parties agree that the scenario presented in this record is unique.  But in identifying the few cases that have encountered this issue, a general rule emerges. That rule provides that disqualification may be warranted even where no direct attorney-client relationship exists between the party seeking the disqualification and the attorney whose disqualification is sought.  In a situation involving a joint defense agreement, a former co-defendant of an attorney's client may seek disqualification of that attorney in a subsequent suit if (1) the attorney is now representing an adversary of the former co-defendant, (2) if the matters are substantially related and (3) if confidential information was exchanged during the prior action.  This rule follows

from binding precedent in this circuit, that has been adopted by other circuits. *See Wilson P. Abraham Construction Corp. v. Armco Steel Corp.,* 559 F.2d 250, 253 (5th Cir. 1977), *cited in United States v. Henke,* 222 F.3d 633 (9th Cir. 2000); *see, e.g., All Am. Semiconductor, Inc. v. Hynix Semiconductor, Inc.,* No. C 07–1200, 2008 WL 5484552, at *4-5 (N.D.Cal. Dec. 18, 2008); *Cochran v. Five Points Temporaries, LLC*, No. 2:10-CV-3522-SLB, 2012 WL 4726285, at *8 (N.D. Ala. Sept. 27, 2012) (noting that "some courts have held that, in a situation involving a joint defense agreement, a former co-defendant of an attorney's client may seek disqualification of that attorney in a subsequent suit where the attorney is now representing an adversary of the former co-defendant").

In our circuit precedent, *Armco Steel,* the court held that when information is exchanged between co-defendants and their attorneys, an attorney who has received such information owes a fiduciary duty to non-client co-defendants not to use the information in a later representation of another client to the detriment of the co-defendants from the previous suit. 559 F.2d at 253. The court acknowledged that there is no *presumption* that confidential information was exchanged when each party is represented by their own counsel (unlike the presumption that follows for dealings with one's own counsel). Instead, when a co-defendant's counsel is involved, the burden is on the party moving to disqualify to show that confidential information had in fact been disclosed to the attorney during the earlier cooperative defense *and* that the matters were substantially related. *Id.* The court reasoned:

> Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which

he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

*Id.* The Fifth Circuit remanded the case to the district court for factual findings focusing on whether the two matters were substantially related and whether confidential information was exchanged during the previous joint defense. *Id.*

Similarly, in *All American Semiconductor,* a California district court disqualified a plaintiff's attorney due to a conflict of interest where the attorney had received confidential information about the defendant in the current suit in the course of representing the plaintiff in a prior joint defense agreement. 2008 WL 5484552, at *7. The court explained:

[A] conflict of interest may be created when, as here, an attorney (Vandevelde [current plaintiff's attorney]) has acquired confidential information about a non-client (Infineon [the current defendant]) in connection with his representation of a client (Hefner), such as when an attorney obtains confidential information about a co-defendant of a client during a joint defense of an action. Indeed, contrary to plaintiffs' contention, the fact that Vandevelde and Infineon never had an attorney-client relationship is not determinative of whether disqualification of [plaintiffs' law firm] is appropriate because an attorney's receipt of confidential information from a non-client may lead to the attorney's disqualification.

*Id.* at *6 (internal quotation marks and citations omitted).  Relying on *Armco Steel Corp.,* the court found that "Vandevelde's participation in the [joint defense agreement] and receipt of confidential information from Infineon during the joint defense created an expectation on the part of Infineon that this information would be kept confidential. This was a reasonable expectation, particularly given that the JDA

contained a confidentiality provision." *Id.* at *7.  Accordingly, the court held that Vandevelde was disqualified from representing the plaintiffs against Infineon, a co-defendant under the joint defense agreement in a prior case.  *Id.*

This recognition that fiduciary duties can arise from communications undertaken in joint defense arrangements can also be found in a 1995 formal ethics opinion from the American Bar Association.  This Opinion supports the view that an attorney owes a fiduciary duty not to betray the confidences of the former co-defendant of his client, which duty may also require disqualification.  The ABA Opinion addresses the situation of a lawyer who had represented one member of a joint defense group and then, after changing law firms, was asked to represent a new client against a different member of the original joint defense group. The ABA stated the following:

> [T]o the extent that Lawyer had acquired in the course of the prior representation information confidential to other members of the consortium, he might owe an obligation to his former client not to disclose the information by reason of the former client's obligation to the other members. However, ... if [the former client] did give consent [to the representation], there would be presented the question whether Lawyer had any obligation directly to other members of the consortium, who were not his clients but from whom he received information pursuant to an undertaking of confidence. In those circumstances, Lawyer would almost surely have a *fiduciary* obligation to the other members of the consortium, which might well lead to his disqualification. *See Wilson P. Abraham Construction Corp. v. Armco Steel Corp.,* 559 F.2d 250, 253 (5th Cir.1977).

This fiduciary obligation is said to arise from the law of agency (the lawyer having been a sub-agent of the client who in turn was the agent of the co-defendant with whom the confidential information is shared), rather than from the law

governing lawyers.  "[The lawyer] would not, however, owe an *ethical* obligation to them, for there simply is no provision of the Model Rules imposing such an obligation." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 95–395 (1995) (emphasis added).

Based on the logic of the ABA opinion that follows the Eleventh and Ninth Circuit's application of the rule in these situations, Mr. Shohat does not owe an *ethical* obligation to brother 2 because he never represented brother 2 directly at the time he represented brother 1.  Indeed, no one has accused Mr. Shohat of committing any ethical violation, and the Court finds in fact that the record shows to the contrary. Mr. Shohat has at all times been open as to his dealings with brother 2 and fully cooperative in the proper resolution of the matter before the Court.  As the ABA put it, this is not an ethical issue; it is, however, a legal issue that arises from implied fiduciary obligations to brother 2 if confidential information was shared under the joint defense agreement and the matter involved a substantially related matter (in this case *the same matter*).  That duty cannot be extinguished in this case simply because Mr. Shohat's current client waives any potential or actual conflict, nor because Mr. Shohat sincerely believes he can compartmentalize any confidential knowledge he has from brother 2 in his representation of this Defendant.

The crux of the problem we face is that it is undisputed that Mr. Shohat learned confidential information from brother 2.  And now he seeks to represent a co-defendant in the same case who is undoubtedly adverse now to the interests of brother 2.  This presents a situation that warrants the Court protecting those implied

fiduciary duties and preserving those confidences by requiring Defendant to retain substitute counsel in this case.

Mr. Shohat contends that the appropriate remedy here is simply to retain substitute counsel who will be in charge of cross-examining brother 2 at trial and overseeing that part of the defense case. Yet, cross-examination and impeachment is not the only concern. After all the same confidences that brother 2 is seeking to preserve include those that Mr. Shohat's direct client, brother 1, is also entitled to protect. It is hard to see how from the inception of his representation for this new client Mr. Shohat has been able to completely isolate in his mind facts or strategies that were discussed in those early meetings in Panama. Wittingly or unwittingly, there is a present risk that those confidences have infected the strategies and theories that Mr. Shohat has already formulated for Defendant, even if he consciously believes he did not convey any "confidential information" in the process. It is naïve to conclude that Mr. Shohat's representation of this Defendant has been entirely divorced from what Mr. Shohat learned from brother 1 and brother 2 during those privileged discussions. That alone is material prejudice that warrants disqualification at this stage because damage may have already taken place from the former clients' perspective.

Disqualification is also the most appropriate remedy given that the case against the Defendant is still in its infancy and he has not yet been arraigned. There is thus no irreparable prejudice in precluding Mr. Shohat from representing him for the rest of the case. The appropriate remedy under these circumstances is

disqualification because the same concerns that are presented with an actual conflict from prior representation are present here:

> If the conflict could cause the defense attorney improperly to use privileged communications in cross-examination, then disqualification is appropriate. Indeed, it is also true that disqualification is equally appropriate if the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client or to advance the attorney's own personal interest. In short, the court must protect its independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards.

*United States v. Ross,* 33 F.3d at 1523 (affirming order disqualifying counsel because "defense counsel could either have tread dangerously close to confidential matters in attempting to explain this transaction [here between brother 2 and Vuteff] or, alternatively, could have improperly avoided related issues.").

### B.   Almeida *Does Not Control This Case*

The gravamen of Defendant's argument to the contrary is that a waiver of brother 2's confidences as to Mr. Shohat has taken place.  To establish this, Defendant first relies heavily on the Eleventh Circuit's ruling in *Almeida*, where the court held that a defendant who withdrew from a JDA to turn "state witness" against his former joint defense partner, waived the confidentiality privilege that applied to the communication held during the joint defense meetings between the parties and their respective counsel.  *Almeida*, 341 F.3d at 1323.

According to Defendant, the *Almeida* holding should not be limited to situations wherein a member of a JDA abandons the orbit of the joint legal effort to cooperate with the government against his former joint defense partners.  Instead,

Defendant suggests that *Almeida* stands for the broader proposition "that it would be wrong as a matter of policy to allow a former JDA member to hide behind the attorney-client privilege once he has agreed to [cooperate] and to testify against his former accomplices," irrespective of whether those former accomplices were members of the JDA.  [D.E. 42 at 10].  We disagree with Defendant's sweeping reading of *Almeida* because Defendant's construction of the case goes beyond the opinion's own holding and is inconsistent with binding—and on point—Fifth/Eleventh Circuit precedent.

*Almeida* implicated two defendants (Almeida and Fainberg) who were accused of conspiring to distribute cocaine.  Recognizing the advantages of pooling their legal efforts, they decided to enter into an oral JDA, with each individual being represented by his respective counsel.  *Almeida*, 341 F.3d at 1320.  However, approximately one month before trial, and after countless communications between the parties and their lawyers, Fainberg withdrew from that united front and turned state witness against Almeida.  *Id.*  Despite having withdrawn from the JDA and having assumed a legal posture that was adverse to that of former joint defense partner, Fainberg invoked the attorney-client privilege as to Almeida and his defense team.  According to Fainberg, the joint defense communications were privileged and, as such, Almeida and his legal team were precluded from using them against Fainberg in any way at Almeida's trial.  *Id.*  Agreeing with Fainberg, the district court barred Almeida and his counsel from using any of the information obtained from Fainberg during the joint defense meetings at trial.  *Id.* at 1322.  Almeida was convicted.

On appeal, the Eleventh Circuit reversed, holding "that the [district] court abused its discretion *when it precluded Almeida* from utilizing the communications that Fainberg made to Almeida's attorneys while operating under the joint defense agreement." *Id*. at 1323 (emphasis added). While the court recognized that a duty of confidentiality does in fact arise in the context of JDAs as to other members of the joint defense and their counsel, the court also noted that certain exceptions can apply to this privilege. *Id*. at 1324–26. The court then held that one such exception, as illustrated by Fainberg's acts, occurs when a party to the JDA chooses to abandon the orbit of that united front to become a witness for the state against his former JDA partner. *Id*.

Defendant disagrees with this narrow reading of *Almeida*, suggesting instead that the holding squarely applies to the situation at hand: that is, where a JDA member testifies for the government against a party who was never part of the joint defense. Several factors lead us to reject this view.

First, we read the scope of *Almeida*'s holding as expressly tailored to situations involving members and former members of a JDA. That was the factual scenario presented to the court, and nothing on that record suggests that the panel intended to go beyond that scenario. Indeed, the very holding of the opinion is prefaced by an express allusion to this factual requirement. *See id*. at 1326 ("We hold that when *each party to a joint defense agreement* is represented by his own attorney, and when communications by one co-defendant are made to the attorneys of other co-defendants, such communications do not get the benefit of the attorney-client

privilege in the event that the co-defendant decides to testify on behalf of the government in exchange for a reduced sentence."). *See also id*. at 1323 ("we hold that the court abused its discretion when it precluded Almeida [a party to the JDA] from utilizing the communications that Fainberg made [during the JDA]"). This is also how other courts have interpreted *Almeida. See, e.g., Cochran v. Five Points,* 2012 WL 4726285, at *8 ("*Almeida* addressed the effect of a co-defendant's decision to defect from the joint defense agreement on the status of the joint defense privilege, holding that the defendant's decision to defect renders that defendant's communications to the co-defendant's attorney no longer privileged. The case did not address the situation presented here . . . ").

Second, the court's discussion of the justifications for recognizing implicit waivers of the joint defense privilege only reenforces the notion that the ruling was restricted to cases involving individuals who are or were part of the JDA. Among other things, the *Almeida* court cited to Fifth Circuit precedent, state court rulings, and treatises that uphold the concept of waiver grounded on the theory that the protections that emanate from a shared common interest are inherently nullified when the parties become engaged in controversy with one another and their interests cease to be aligned. *See, e.g, Almeida*, 341 F.3d at 1324–25 ("it is clear that the privilege becomes inapplicable" when the two persons "become engaged in controversy") (citing *Jones v. State*, 65 Miss. 179, 184, 3 So. 379, 380 (1888) ("The reason for maintaining such privilege ceases when one has voluntarily exposed himself by his own testimony to the very consequences from which it was intended

by the privilege to protect him.")).  In other words, these rationales justify waiver on the basis that, when parties who share a joint legal interest undermine the objectives of their united effort, the protections designed to support the pursuit of their shared legal goal are voided.

With these principles in mind, we find it hard to agree with Defendant that *Almeida*'s waiver squarely applies to the case at hand.  Unlike *Almeida*, Mr. Vuteff was never a party to the JDA between the brother and their lawyers, nor was Mr. Vuteff an intended beneficiary of the joint defense.  Moreover, the available record is devoid of any evidence suggesting that the JDA between brother 1 and brother 2 ever ceased to exist, that their interests do not remain aligned, or that there are any prospects of divergence of interests between the two of them in the future.[2] There is also no evidence suggesting that either brother 1  or brother 2 have disclosed any of their confidential communications with Mr. Shohat to the Government's trial team.  Therefore, we are hard pressed to find that Fainberg's defection from the JDA and his betrayal of Almeida is analogous or applicable to our case, where the only relevant individual who could be deemed to have departed the JDA—and now in

---

[2] Indeed, the Government highlighted in its submissions and during hearings that the opposite is true and noted that there is a distinct possibility that brother 1 will join brother 2 in testifying against Mr. Vuteff at his trial.  While the Government conceded that brother 1 does not have knowledge of Vuteff's direct involvement in the scheme, brother 1 does possess knowledge over other aspects of the bribery and money laundering scheme.

pursuit of an interest that is adverse to the brothers' joint defense effort—is Mr. Shohat.[3]

All these reasons, paired with the fact that *Almeida* was not a disqualification case, and that the panel in *Almeida* appears to expressly limit its ruling to the facts of the case, leads us to conclude that Defendant's reliance on *Almeida* is misplaced. *See Almeida*, 341 F.3d at 1326 n.20 (refusing to address whether accomplices always waive privilege when they testify on behalf of the government because "[t]he facts of this case [] do not require us to establish such a sweeping rule."); *id.* at n.21 (emphasizing that *parties to joint defense agreements* should memorialize their agreements in writing to ensure they understand how waiver applies as to them). This same reasoning applies to Defendant's reliance on *United States v. Wings*, No. 1:05-CR-316-20-BBM, 2007 WL 9676968, (N.D. Ga. Aug. 10, 2007), a case involving a state witness who defected a JDA to testify against his former joint defense partner.[4]

---

[3] Defendant's counsel raised multiple hypotheticals at the hearing and in his briefs suggesting that this reading of *Almeida* is illogical, but his hypotheticals are actually consistent with our holding.  [D.E. 84 at 8 n.3].  For instance, he points out that if the Government were prosecuting brother 1 and Mr. Vuteff jointly, with brother 2 testifying against **both** of them, then it would be illogical to allow counsel for brother 1 to cross-examine brother 2 but to prevent Mr. Shohat from doing the same.  We agree.  The obvious flaw in Mr. Vuteff's hypothetical is that, in such a case, by taking action against his former joint defense partner, brother 2 would be defecting from the JDA and undermining its intended purpose of pursuing a joint legal objective.  That is simply not the fact pattern here.

[4] Actually, contrary to Mr. Vuteff's claim, the court in *Wings* appears to agree with our reading of *Almeida*: "The Eleventh Circuit has plainly held that once a defendant agrees to turn state's evidence, he has voluntarily surrendered any [of] the protections of attorney-client privilege, at least as to counsel of a co-defendant **with**

Instead, we find that this case is subject to the controlling Eleventh Circuit precedent discussed earlier, which establishes that attorneys who gain access to confidential information in the context of JDAs are restricted from proceeding against other members of the joint defense in substantially related matters. *See, e.g., Armco Steel Corp.*, 559 F.2d at 251.[5] As stated earlier, much as in our case, in *Armco Steel* the alleged conflict of interest originated not from the lawyer's prior client but from the confidences shared by the client's co-defendant during joint defense sessions. *See id.* at 251, 253. Agreeing with the movants' contention that joint defense discussions in a conspiracy case are privileged and made for the exclusive purpose of furthering the joint parties' common cause, the court agreed that "[i]n such a situation, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants." *Id.* at 253.

Similarly, a district court in *All Am. Semiconductor*, which followed Ninth Circuit precedent that had approved of the analysis in *Armco Steel*, disqualified plaintiffs' counsel on the basis that a partner at that law firm (Vandevelde) had obtained confidential information from a former client's co-defendant (Infineon) in the context a joint defense agreement. *All Am. Semiconductor, Inc.*, 2008 WL

---

*whom he had a joint defense agreement*." *Wings*, 2007 WL 9676968 at *4. (emphasis added).

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

5484552.  The *All Am. Semiconductor* court ordered disqualification despite the fact that neither the subject law firm nor Vandevelde had ever had an attorney-client relationship with Infineon, the subject law firm had preemptively "walled-off" Vandevelde from all contacts with the case, and the JDA expressly provided that Infineon waived its rights to seek disqualification based upon Vandevelde's participation in the JDA.  *Id.* at *3-7 ("a joint defense agreement can create a disqualifying conflict where information gained in confidence by an attorney becomes an issue.") (citing *United States v. Henke,* 222 F.3d at 637).

We find this line of cases, rather than *Almeida*, applicable to the question at hand, and hold that, consistent with these legal principles, the disqualification of Mr. Shohat and his law firm is warranted in this case.  As noted above, the available record reflects that Mr. Shohat was privy to confidences in the course of the JDA between his former client and brother 2; that the information that brother 2 relayed to Mr. Shohat during these joint defense meetings relates to and is materially adverse to Mr. Shohat's current client; that Mr. Shohat's client was never a party to the JDA; that the JDA between brother 1 and brother 2 remains in effect; that the only relevant party who has departed the brothers' unified front is Mr. Shohat; that brother 2, and potentially brother 1, will testify against Mr. Shohat's client in this case; and that neither brother has waived any conflict of interest arising from Mr. Shohat's representation of brother 1 or his corollary participation in the brothers' JDA.  In view of these facts, we find it appropriate to disqualify counsel.

Mr. Vuteff objects, pointing out that cases such as *Armco Steel* involved civil litigation that did not implicate a criminal defendant's Sixth Amendment right to counsel of choice, unlike the present case. Yet, that argument misses the mark because, as previously mentioned, both the Supreme Court and the Eleventh Circuit have unambiguously found that this Sixth Amendment right "is curtailed 'where a court justifiably finds an actual conflict of interest' or 'where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.'" *United States v. Schneider*, 322 F. Supp. 3d 1294, 1299 (S.D. Fla. 2018), *aff'd*, 853 F. App'x 463 (11th Cir. 2021) (quoting *Wheat*, 486 U.S. at 162–64).

Indeed, the Eleventh Circuit has recognized that the right to counsel of choice should be set aside when the proper, efficient, and orderly administration of justice is undermined by the serious prospects of the improper use of confidential information. This includes situations where the right to counsel of choice is in direct conflict with defendant's Sixth Amendment rights to conflict-free counsel. *See Ross*, 33 F.3d at 1523 ("If the conflict could cause the defense attorney improperly to use privileged communications in cross-examination, then disqualification is appropriate. . . . In short, the court must protect its independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards."). And the Court is also cognizant that it is not just Vuteff's right to counsel that is implicated. The Court's obligation is also to enforce brother 1 and brother 2's right to counsel as well, which includes the right to unfettered communications with counsel engaged in joint defense strategy meetings. The

Court's Order here is thus designed to balance Mr. Vuteff's Sixth Amendment rights with those of Mr. Shohat's earlier clients – brother 1 and brother 2. That balance tips strongly in favor of disqualification.

As noted above, a showing of actual (as to brother 2) and potential (as to brother 1) conflict has been made here. There are not only significant concerns regarding the potential use, whether explicit or implicit, of confidential information obtained during the JDA by Mr. Shohat or his team in their preparation of Mr. Vuteff's defense, but there is also the parallel risk that Mr. Vuteff's right to conflict-free counsel may be compromised by the counsel's efforts to avoid any breach of the confidentiality privilege.

Plus, the serious risks of the improper use of confidential information, coupled with the infancy of this representation, also weigh in favor of disqualification. At this point early in this proposed representation Mr. Shohat and Mr. Vuteff have not spent "hundreds of hours preparing for the case", have not "hired jury consultants" and "financial analysts", nor have they "been through every single piece of paper in discovery for this case." *Wings*, 2007 WL 9676968 at *2. As the Government points out, discovery in this case has not even begun, and once discovery ensues the potential for deeper conflict or new conflicts will only increase. Considering the existing and potential conflicts that have been identified thus far, there is minimal justification for continuing with a representation that poses such a significant risk of encountering further disqualification issues later in discovery or at trial, when the harm to the defendant, the prosecution, and the court will only be greater. Accordingly, we are

compelled to uphold our "independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards," and order the disqualification of Mr. Shohat and Jones Walker from this case. *See also United States v. Cordoba*, No. 12-20157-CR, 2013 WL 5741834, at *12 (S.D. Fla. Oct. 17, 2013) ("Even if the Court found that an actual conflict of interest did not exist in this case, the facts adduced at the four hearings on this matter, coupled with the pleadings filed by the parties, also support disqualification [] based on a finding of a serious potential conflict of interest. The actual conflict of interest in this case is palpable; there are a myriad of potential conflicts of interest as well.").

Mr. Vuteff again insists that we can avoid disqualification in this case by allowing his counsel to introduce an independent lawyer to handle brother 2's (or potentially brother 1's) cross-examination at trial. We are unpersuaded. Florida courts have not embraced the use of such "ethical wall" measures as an adequate remedy for curing conflicts of interest. Instead, the law in our district is that "if one attorney in a firm has an actual conflict of interest, we impute that conflict to all the attorneys in the firm, subjecting the entire firm to disqualification." *Ross*, 33 F.3d at 1523.

Moreover, and as the Government rightly points out, invitations to adopt independent counsel have been flatly rejected in cases where the potentially aggrieved parties refuse to waive any potential conflict, which brother 1 and brother 2 have done here. *See*, *e.g.*, *Cordoba*, 2013 WL 5741834 at *12 ("The use of second counsel to handle Mr. Cambara's cross-examination is an imperfect and ineffective

solution, especially where Mr. Cambara expressly objects to such an arrangement.");
*United States v. Miranda*, 936 F. Supp. 945, 952 (S.D. Fla. 1996) ("Given Lopez's non-consent to Shohat's representation of Miranda, and the Court's determination of the existence of an actual conflict of interest, permitting the use of back-up counsel" as an "alternative to disqualification [is] inappropriate for this case").

Considering the nature of the conflicts in this case, and that neither brother has consented to the independent counsel solution, we disagree with Defendant's view that disqualification can be avoided here with the introduction of independent counsel for the purposes of cross-examination.

### C.   *Subject-Matter Waiver Has Not Taken Place*

Defendant alternatively argues that, even if *Almeida*'s waiver does not apply to this case, brother 2 has effectively waived his claim to privilege under the sword and shield waiver doctrine by virtue of his participation in these disqualification proceedings.  Specifically, Defendant argues that this court should determine that brother 2 has waived any privilege pertaining to the content of his joint defense communications with Mr. Shohat, given his submission of a sealed affidavit and his *in camera* testimony in support of the Government's motion to disqualify.  [D.E. 84_at_5–7].  We find Defendant's waiver arguments also unpersuasive.

Defendant's argument relies primarily on the holding of *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 286 F.R.D. 661 (S.D. Fla. 2012), where the court ruled that a party contesting a motion for Rule 11 sanctions could not utilize privileged communications to strengthen its response without simultaneously waiving the

privilege associated with those communications. On the face of that holding, the disconnect between that situation and ours is plain to see.

For starters, we disagree with the proposition that *QBE*'s waiver by voluntary disclosure rule is applicable in the context of these disqualification proceedings, which seek to uphold mandatory ethical standards—as opposed to pursuing affirmative relief—and where the very crux of the inquiry concerns the nature and extent of the privileged communications to which counsel was exposed. Indeed, this view finds support in *QBE*'s ruling, where the court's analysis hinged on the central point that "a party is under no obligation to disclose privileged information during a Rule 11 proceeding. Instead, it has the opportunity to decide *whether* to make such a disclosure." *QBE Ins. Corp.*, 286 F.R.D. at 665.

In our case, by contrast, the very essence of the disqualification inquiry—whether the communications to which Mr. Shohat was privy in the course of the JDA raised a conflict—required the examination of privileged communications, and the privileged materials were produced for *in camera* review pursuant to an order from the undersigned.

Additionally, it was Mr. Shohat who requested an evidentiary hearing from the very beginning of the proceedings, as he expressly objected to the Government's motion on the basis that the affidavits in support were factually insufficient, that the relevant confidences did not amount to material adversity, and that this court could not make the required factual findings to disqualify him in the absence of some sort

of direct testimony from and examination of brother 2.[6]  [D.E. 77 at 4:7–10, 21:23–23:8, 32:16–20], [D.E. 78 at 77:12–20, 105:7–22].  Thus, Defendant's suggestion that *QBE*'s unilateral, voluntary, and unnecessary introduction of privileged materials bears any resemblance to our case is legally unfounded.  *See*, *e.g.*, *Fla. House of Representatives v. U.S. Dep't of Com.*, 961 F.2d 941, 946 (11th Cir. 1992) ("We find it difficult to characterize the court-ordered disclosure of the data in City of New York as a voluntary waiver of the Department's privilege in light of the court order"); *Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) ("Because these express waiver cases do not involve the court-ordered disclosure of privileged information . . . we do not find them particularly useful in ascertaining the scope of Bittaker's waiver of his attorney-client privilege under the fairness principle.").

Finally, Defendant's other theory, that the pre-hearing statements in brother 2's affidavit also amount to a subject matter waiver, also lacks merit.  As noted above, the Government's motion relied on sealed affidavits filed by both brothers.  [D.E. 62-1].  According to Defendant, the statements in brother 2's affidavit, particularly those in paragraph seven, go beyond the articulation of mere topics and effectively amount to subject matter waiver. Yet a plain reading of the affidavit contradicts Defendant's construction.  In relevant part, the affidavit states that: "[a]mong the topics discussed, there was a mention about all possible people and activities involved in

---

[6] Accordingly, the Court ordered the appearance of brother 2 at the May 2, 2023, hearing where he testified under seal and in the presence of filter lawyers for both parties.  During that portion of the hearing, the trial teams for both the Government and Defendant were excluded from the courtroom.

this investigation, including Ralph Steinmann and Fernando Vuteff. Discussed were my interactions, and any possible relationships or knowledge of facts that were pertinent in the litigation involving these gentlemen." [D.E. 62-1]. We simply fail to discern how this two-sentence statement reveals anything beyond the general topics of brother 2's JDA discussions, or how it comes close to waiving the privilege of all joint defense communications concerning Mr. Vuteff.

In sum, we hold that neither brother 1 nor brother 2 has waived the confidentiality privilege that attached to their JDA discussions with Mr. Shohat and, as such, Mr. Shohat and his law firm's representation of Mr. Vuteff raise actual and potential conflicts of interest that warrant disqualification.

One final but important point. It is certainly not the intent of this Order to foreclose or prevent parties and counsel from entering into joint defense agreements in multi-defendant criminal cases. To the contrary; joint defense agreements have a necessary purpose by allowing counsel to pool their resources in complex cases against the power of the federal government. But that beneficial purpose implicates important judicial interests that must be safeguarded. And one such important interest is illustrated by the circumstances involved here. A criminal defendant will conclude that defense counsel pursuing a common interest and sharing privileged discussions will do so with the understanding that he or she should not be able to turn around and use those confidences against him, directly *or* indirectly.

This expectation is indeed a foundational one for the recognition of the joint defense privilege in the first place.  As early federal cases recognizing the privilege explained:

> When the Ingram and McPartlin camps decided to join in an attempt to discredit [lead government witness Benton], the attorney for each represented both for purposes of that joint effort. The relationship was no different than it would have been if during the trial the Ingram and McPartlin attorneys had decided that Ingram's attorney would cross-examine Benton on behalf of both, and during cross-examination McPartlin passed Ingram's attorney a note containing information for use in the cross-examination. *The attorney who thus undertakes to serve his client's co-defendant for a limited purpose becomes the co-defendant's attorney for that purpose.*

*United States v. McPartlin,* 595 F.2d 1321, 1337 (7th Cir. 1979) ("The common-defense rule . . . has been recognized in cases spanning more than a century. *Chahoon v. Commonwealth,* 62 Va. (21 Gratt.) 822 (1871); *Schmitt v. Emery,* 211 Minn. 547, 2 N.W.2d 413 (1942).") (emphasis added).  And this is so because "[t]he layman's course through litigation must at least be evened by the assurance that he may, without penalty, invest his confidence and confidences in a professional counsellor. . . . That assurance is no less important or appropriate where a cooperative program of joint defense is helpful or, a fortiori, necessary to form and inform the representation of clients whose attorneys are each separately retained." *Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381, 388 (S.D.N.Y. 1975) (citations omitted).

Hence, the principle that joint defense or common interest communications have the benefit of privileged protection only arises from the law's recognition that the attorneys participating in that venture are acting as counselors for *all* the clients

involved.  So, these same attorneys must do so with the full understanding that fiduciary duties will follow, which in a case like this includes the obligation not to stand against one of those clients for the benefit of someone else, at least involving substantially the same matters.  A breach of these duties should be avoided whenever possible.  Given the early stage of the case we find ourselves in here, disqualification is the most responsible and appropriate remedy.

## IV.  CONCLUSION

For the foregoing reasons, the Government's motion to disqualify Defendant's counsel Mr. Shohat and the law firm of Jones Walker from these criminal proceedings is **GRANTED.**  Defendant shall retain substitute counsel.  Arraignment shall be held on July 11, 2023, at 10:00 am before the Duty Judge.  Any appeal of this Order shall stay this deadline pending further Order of the Court.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of June, 2023.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge